**KENNECOTT COPPER CORPORATION,**
Petitioner,

v.

**ENVIRONMENTAL PROTECTION
AGENCY, Respondent,**

**The Project on Clean Air of the Natural
Resources Defense Council, Inc., et al.,**
Intervenors.

**No. 71–1410.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 20, 1972.

Decided Feb. 18, 1972.

Mr. William H. Dempsey, Jr., Washington, D. C., with whom Mr. David W. Miller, Washington, D. C., was on the brief, for petitioner.

Mr. Raymond N. Zagone, Atty., Department of Justice, with whom Mr. Shiro Kashiwa, Asst. Atty. Gen., and Messrs. Edmund B. Clark and James R. Walpole, Attys., Department of Justice, were on the brief, for respondent.

Mr. Richard E. Ayres, New York City, for intervenor Project on Clean Air of the Natural Resources Defense Council, Inc.

Messrs. Hugh B. Cox and Richard B. Herzog, Washington, D. C., were on the brief for intervenors Newmont Mining Corporation and Magna Copper Company.

Before WRIGHT, TAMM and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

In this appeal, Kennecott Copper Corporation attacks the "national secondary ambient air quality standards" for sulfur oxides, promulgated by the Environmental Protection Agency on April 30, 1971.[1] It raises as objections that the

---

1. As part of the National Primary and Secondary Ambient Air Quality Standards, 36 Fed.Reg. 8186. The Notice of Proposed Rule-making was published on January 30, 1971, see 36 Fed.Reg. 1502.

standards (1) were not "based on" the underlying "air quality criteria" issued by the Government, as required by Section 109 of the Clean Air Act (Act), as amended in 1970;[2] (2) were not accompanied by a "concise general statement of their basis and purpose" as required by § 4(c) of the Administrative Procedure Act,[3] and in any event (3) were not adequately supported by a statement of their basis necessary to insure adequate judicial review.

The Act provides for the establishment of national primary and secondary ambient air quality standards, to prescribe maximum concentrations of pollutants that will be permitted in the air of our country. Primary standards are those "requisite to protect the public health," while secondary standards are those "requisite to protect the public welfare," which is defined[4] as including, but not limited to, "effects on soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being."

This appeal involves the non-health-related "secondary" standards for sulfur oxides, which are more stringent than the "primary" standards, though greater time flexibility is provided for attaining secondary standards.[5] In particular, this appeal has come to focus on the requirement in the secondary air quality standard limiting the annual arithmetic mean amount of sulfur oxides (sulfur dioxide) to: "60 micrograms per cubic meter—annual arithmetic mean."

Sections 108 and 109 of the Act,[6] reprinted in the Appendix, are the key sections for present purposes. The statute requires air quality criteria, if not issued prior to the 1970 amendments, to be issued by the Administrator within 12 months after the listing of an air pollutant. The Administrator is required to publish and revise a list which includes each pollutant present in the ambient air, from numerous or diverse mobile or stationary sources, which in the judgment of the Administrator "has an adverse effect on public health or welfare."[7]

Section 108 makes clear that the term "air quality criteria" is not used in the law with the conventional meaning of "criterion," as referring to a standard. What the term refers to is a document which "shall accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of such pollutant in the ambient air, in varying quantities."[8]

Section 109 of the Act provides for expeditious issuance of air quality standards "based on" the criteria. They were required within 30 days after the 1970 enactment of P.L. 91–604, for each air pollutant for which air quality criteria had been issued prior to such enactment. As for criteria issued subsequent to the 1970 law, the Administrator is required, simultaneously, to publish proposed national air quality standards. In either event the air quality standards prescribe a level of air quality "the attainment and maintenance of which in the judgment of the Administrator, based on such criteria" is requisite to protect the public interest—in the case of primary standards, "requisite to protect the

---

2. Clean Air Amendments of 1970, 84 Stat. 1676, P.L. 91–604, § 4, 42 U.S.C. § 1857c–4(b).

3. 5 U.S.C. § 553(c).

4. 42 U.S.C. § 1857h(h).

5. By Section 110 of the Act, 42 U.S.C. § 1857c–5, and in particular subsections (a) (2) (A) (ii) and (b).

6. 42 U.S.C. §§ 1857c–3, 1857c–4.

7. Section 108(a) (1) (A) of the Act, 42 U.S.C. § 1857c–3(a) (1) (A).

8. 42 U.S.C. § 1857c–3(a) (2). By implication this provision is applicable to criteria issued prior to the 1970 Amendments on which standards issued subsequent to those amendments are based.

public health;" in the case of secondary standards, "requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air."

Congress provided for informal rule-making, for proposed standards, written comments thereon, without any general necessity for evidentiary submissions, culminating in promulgation by regulation of standards based on the criteria.

In the case before us the air quality criteria were published in January 1969, prior to the 1970 law, by the Department of Health, Education and Welfare.[9] No contention is made that they were not adequate to serve the function contemplated of criteria under the 1970 law, of reflecting pertinent scientific knowledge concerning effects that may be expected from the presence of the pollutant. The complaint is that there is no adequate indication of the basis of the 1971 standard of 60 micrograms per cubic meter. It is particularly stressed that the summarizing "Resume" paragraph, reproduced in the footnote,[10] of the 1969 Criteria refer to no effects at a level below 85 micrograms per cubic meter. While the statement of the purpose and nature of the regulation set forth the basis for

the primary standards, simultaneously adopted, in some detail, as to secondary standards the Administrator said only:

National secondary ambient air quality standards are those which, in the judgment of the Administrator, based on the air quality criteria, are requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of air pollutants in the ambient air.

In support of the EPA's annual standard of 60 micrograms per cubic meter, the Government and intervenor, National Resources Defense Council,[11] refer to lower figures in the material in the body of the Criteria, saying that the Resume is not conclusive. In the alternative they argue that the 85 figure in the Resume supports a 60 standard, on the basis of the Administrator's judgment as to anticipated effects and a margin necessary to avoid the adverse effects noted at the 85 level.

We do not undertake to rule on these particular matters. This court has been assigned special responsibility for determining challenges to EPA's air quality standards.[12] This judicial review rests on the premise that agency and court "together constitute a 'partnership' in furtherance of the public interest, and

9. *Air Quality Criteria For Sulfur Oxides*, published in January 1969 by the United States Department of Health, Education, and Welfare, Public Health Service, Consumer Protection and Environmental Health Service, National Air Pollution Control Administration.

10.    C. RESUME

In addition to health considerations, the economic and aesthetic benefits to be obtained from low ambient concentrations of sulfur oxides as related to visibility soiling, corrosion, and other effects should be considered by organizations responsible for promulgating ambient air quality standards. Under the conditions prevailing in areas where the studies were conducted, adverse health effects were noted when 24–hour average levels of sulfur dioxide exceeded 300 ug/m3 (0.11 ppm) for 3 to 4 days. Adverse health effects were also noted when the annual mean level of sulfar dioxide exceeded 115 ug/m3

(0.04 ppm). Visibility reduction to about 5 miles was observed at 285 ug/m3 (0.10 ppm) ; adverse effects on materials were observed at an annual mean of 345 ug/3 (0.12 ppm) ; and adverse effects on vegetation were observed at an annual mean of 85 ug/m3 (0.03 ppm). It is reasonable and prudent to conclude that, when promulgating ambient air quality standards, consideration should be given to requirements for margins of safety which take into account long-term effects on health, vegetation, and materials occurring below the above levels.

11. This intervention will be permitted to stand for purposes of the Council's presentation, on a basis different from that of the Government, of materials and argument in support of the annual standard. We do not find it necessary to rule at this juncture on any other aspect of the intervenor's standing.

12. 42 U.S.C. § 1857h–5(b) (1).

are 'collaborative instrumentalities of justice.' The court is in a real sense part of the total administrative process." Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841, 851–852, cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). Inherent in the responsibility entrusted to this court is a requirement that we be given sufficient indication of the basis on which the Administrator reached the 60 figure so that we may consider whether it embodies an abuse of discretion or error of law.[13]

The provision for statutory judicial review contemplates some disclosure of the basis of the agency's action. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943). We are not to be taken as specifying that the agency must provide the same articulation as is required for orders or regulations issued after evidentiary hearings. Greater Boston Television Corp. v. FCC, *supra*, 444 F.2d at 851. We are keenly aware of the need to avoid procedural strait jackets that would seriously hinder this new agency in the discharge of the novel, sensitive and formidable, tasks entrusted to it by Congress. This concern is emphasized by the fact that in the 1970 Amendments Congress was significantly concerned with expedition [14] and avoidance of previous cumbersome and time-consuming procedures in effect under prior law.[15]

13. As to any agency approach based on "margin of error," the appellant concedes some latitude for a figure below the 85 level which was identified as in the criteria as producing harm to vegetation. But appellant contends that a figure as low as 60 is inconsistent with the law's failure to include, as to secondary standards, the phrase "margin of safety" set forth in § 109(b) for primary standards. We intimate no view on this contention. We point it out to identify the kind of legal issue that cannot meaningfully be disposed of without some awareness of the basis of the Administrator's action.

14. H.Rept.No.91–1146, 91st Cong., 2d sess., pp. 1, 5 (1970), U.S.Code Cong. & Admin. News, pp. 5356, 5360.

"The purpose of the legislation reported unanimously by your committee is to speed up, expand, and intensify the war against air pollution * * *. While a start has been made in controlling air pollution since the enactment of the Air Quality Act of 1967, progress has been regrettably slow. This has been due to a number of factors: (1) cumbersome and time-consuming procedures called for under the 1967 act * * *. Therefore, it is urgent that Congress adopt new clean air legislation which will make possible the more expeditious imposition of specific emission standards * * * and the effective enforcement of such standards by both State and Federal agencies." See also Sen. Muskie, 116 Cong.Rec. 32901 (9–21–70): " * * * we have learned that the air pollution problem is more severe, more pervasive, and growing faster than we had thought. Unless we recognize the crisis and generate a sense of urgency from that recognition, lead times may melt away without any chance at all for a rational solution to the air pollution problem."

15. The President's proposal for national standards served to shorten the time period for controlling air pollution. Hearings in each region prior to adoption of regional air quality standards were to be eliminated. No longer could each State propose different sets of standards. No longer would the Government have to review 50 different sets of standards. Time would not have to be devoted to selecting regional boundaries; instead, States could concentrate on developing effective, enforceable implementation plans.

Congress not only was in accord, but further accelerated pollution control efforts. First, specific deadlines for proposal and promulgation of national ambient air quality standards (for pollutants, such as sulfur oxides, for which criteria had previously been issued) were written into the legislation. Second, a time limit for approval or disapproval of state implementation plans was established. Third, specific time limits were established by which the implementation plans had to achieve the national primary ambient air quality standards. Finally, to assure that the adoption of effective national ambient air quality standards would not be needlessly delayed by litigation in the courts,

■ The provision by Congress of only informal rule-making, as a preliminary to the issuance of standards,[16] and the contemplation of expedition, yield as reasonable corollaries some latitude in the requirement for delineation of approach. While the provision in § 4 of the APA for a "concise general statement" of the basis and purpose of regulations is not to be interpreted over-literally, the regulation before us contains sufficient exposition of the purpose and basis of the regulation as a whole to satisfy this legislative minimum.[17] Particularly as applied to environmental regulations, produced under the tension of need for reasonable expedition and need for resolution of a host of nagging problems, we are loath to stretch the requirement of a "general statement" into a mandate for reference to all the specific issues raised in comments.

■ ■ There are contexts, however, contexts of fact, statutory framework and nature of action, in which the minimum requirements of the Administrative Procedure Act may not be sufficient.[18] In the interest of justice, *cf.* 28 U.S.C. § 2106, and in aid of the judicial function, centralized in this court, of expeditious disposition of challenges to standards, the record is remanded for the Administrator to supply an implementing statement that will enlighten the court as to the basis on which he reached the 60 standard from the material in the Criteria. It is contemplated that the Administrator may and should proceed with all reasonable expedition, just as the court has expedited the hearing of argument and issuance of this remand, in conformance to the legislative judgment as to need for reasonable expedition in achieving this important national goal.[19] It is further contemplated

Congress required those who wished to contest the standards to do so within 30 days after their promulgation. Moreover, jurisdiction to review the standards was placed in this Court alone to avoid conflicting holdings by various federal courts of appeals and thus to assure a prompt and uniform determination on the validity of the standards.

16. No public hearings are required to be held on proposed national ambient air quality standards under the Clean Air Act. Public hearings are required, however, prior to state adoption of implementation plans, to meet and maintain the national standards. Sections 110(a) (1) and (c) of the Act, 42 U.S.C. sec. 1857c–5(a) (1) and (c). The legislative history of the "Clean Air Amendments of 1970" (Pub.L. 91–604) makes it clear that Congress felt public hearings on the national standards were unnecessary in light of the implementation plan hearings and would unduly delay achievement of air quality protective of the public health and welfare. See, for example, Hearings on S. 3229, S. 3466, S. 3546, before the Subcomm. on Air and Water Pollution of the Senate Comm. on Public Works, 91st Cong., 2d sess., Pt. 1, at pp. 152, 154–155, 157–158, 163–164 (1970).

17. Automotive Parts & Accessories Ass'n v. Boyd, 132 U.S.App.D.C. 200, 407 F.2d 330 (1968).

18. Compare Holm & Co. v. Hardin, 145 U.S.App.D.C. 347, 449 F.2d 1009 (1971) ; American Airlines, Inc. v. CAB, 123 U.S. App.D.C. 310, 359 F.2d 624 (en banc), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966). These precedents establish that in a particular case fairness may require more than the APA minimum, but are not to be taken as suggesting in any way that the court considers the kind of problems involved in environment regulations to require more than the written submissions specified by Congress.

19. The EPA has notified the court that it has taken steps, to avoid any possible confusion on the part of the state officials responsible for air pollution control, by notifying them directly that the 24 hour standard is intended to serve as a non-enforceable guideline rather than a mandatory requirement such as the annual standard. Because the states' implementation plans were due on January 30, 1972, only a short time after the problem of possible confusion became apparent, states will upon request be given an "adequate period" during which to revise their implementation plans in light of the clarification.

While we do not say this is mandatory, we think it desirable to use the facilities of the Federal Register, available for interpretative rulings, to assure widespread

that this remand will not halt or delay the on-going proceedings for state adoption of implementation plans to meet and maintain the national standards. To avoid any misunderstanding we state expressly that the Administrator has freedom to revise the Criteria on the basis of material in hand without any requirement of additional submissions.[20] Furthermore, our remand is not to be considered as limiting the Administrator's discretion to enlarge the administrative process as part of his further consideration. Compare FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656 (1940). The Administrator may also provide for receipt of additional material, and even, if he be so advised, may revise the standards without being limited to the procedure of presenting such revisions in the form of recommendations to this court.[21]

The record will be remanded to the Administrator for further action not inconsistent with this opinion.

So ordered.

## APPENDIX

Excerpts from the Clean Air Act of 1963, 77 Stat. 392, P.L. 88–206, as amended by the Air Quality Act of 1967, 81 Stat. 491, P.L. 90–148, and the Clean Air Amendments of 1970, 84 Stat. 1676, and codified in 42 U.S.C. §§ 1857 et seq.

*"Air Quality Criteria and Control Techniques*

"Sec. 108. (a) (1) For the purpose of establishing national primary and secondary ambient air quality standards, the Administrator shall within 30 days after the date of enactment of the Clean Air Amendments of 1970 publish, and shall from time to time thereafter revise, a list which includes each air pollutant—

"(A) which in his judgment has an adverse effect on public health or welfare;

"(B) the presence of which in the ambient air results from numerous or diverse mobile or stationary sources; and

"(C) for which air quality criteria had not been issued before the date of enactment of the Clean Air Amendments of 1970, but for which he plans to issue air quality criteria under this section.

"(2) The Administrator shall issue air quality criteria for an air pollutant within 12 months after he has included such pollutant in a list under paragraph (1). Air quality criteria for an air pollutant shall accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of such pollutant in the ambient air, in varying quantities. The criteria for an air pollutant, to the extent practicable, shall include information on—

"(A) those variable factors (including atmospheric conditions) which of themselves or in combination with other factors may alter the effects on public health or welfare of such air pollutant;

"(B) the types of air pollutants which, when present in the atmosphere, may interact with such pollutant to produce an adverse effect on public health or welfare; and

notice of administrative steps taken in the interest of clarification.

20. At oral argument, counsel for petitioner conceded that the criteria may be amended, on the basis of the record in hand, including comments, without providing for further comments on the amendments. We think that is an appropriate construction of § 108 in the context of this case.

21. The secondary standards promulgated April 30, 1971, remain in effect pending amplification of basis on remand and further review by this court. Following remand proceedings petitioner may supplement its petition to review without filing a new petition to review. In specifying that the Administrator may revise the standards, following the remand, without leave of court we do not speak to the procedures that may be requisite for issuance of revised standards, cf. § 109(b)(2), 42 U.S.C. § 1857(c)–4.

"(C) any known or anticipated adverse effects on welfare.

"(b) (1) Simultaneously with the issuance of criteria under subsection (a), the Administrator shall, after consultation with appropriate advisory committees and Federal departments and agencies, issue to the States and appropriate air pollution control agencies information on air pollution control techniques, which information shall include data relating to the technology and costs of emission control. Such information shall include such data as are available on available technology and alternative methods of prevention and control of air pollution. Such information shall also include data on alternative fuels, processes, and operating methods which will result in elimination or significant reduction of emissions.

"(2) In order to assist in the development of information on pollution control techniques, the Administrator may establish a standing consulting committee for each air pollutant included in a list published pursuant to subsection (a) (1), which shall be comprised of technically qualified individuals representative of State and local governments, industry, and the academic community. Each such committee shall submit, as appropriate, to the Administrator information related to that required by paragraph (1).

"(c) The Administrator shall from time to time review, and, as appropriate, modify, and reissue any criteria or information on control techniques issued pursuant to this section.

"(d) The issuance of air quality criteria and information on air pollution control techniques shall be announced in the Federal Register and copies shall be made available to the general public.

## "National Ambient Air Quality Standards

"Sec. 109. (a) (1) The Administrator—

"(A) within 30 days after the date of enactment of the Clean Air Amendments of 1970, shall publish proposed regulations prescribing a national primary ambient air quality standard and a national secondary ambient air quality standard for each air pollutant for which air quality criteria have been issued prior to such date of enactment; and

"(B) after a reasonable time for interested persons to submit written comments thereon (but no later than 90 days after the initial publication of such proposed standards) shall by regulation promulgate such proposed national primary and secondary ambient air quality standards with such modifications as he deems appropriate.

"(2) With respect to any air pollutant for which air quality criteria are issued after the date of enactment of the Clean Air Amendments of 1970, the Administrator shall publish, simultaneously with the issuance of such criteria and information, proposed national primary and secondary ambient air quality standards for any such pollutant. The procedure provided for in paragraph (1) (B) of this subsection shall apply to the promulgation of such standards.

"(b) (1) National primary ambient air quality standards, prescribed under subsection (a) shall be ambient air quality standards the attainment and maintenance of which in the judgment of the Administrator, based on such criteria and allowing an adequate margin of safety, are requisite to protect the public health. Such primary standards may be revised in the same manner as promulgated.

"(2) Any national secondary ambient air quality standard prescribed under subsection (a) shall specify a level of air quality the attainment and maintenance of which in the judgment of the Administrator, based on such criteria, is requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air. Such secondary standards may be revised in the same manner as promulgated."