## GRAIN PROCESSING CORPORATION et al., Plaintiffs,

### v.

**Russell E. TRAIN, as Administrator, Environmental Protective Agency, Defendant.**

Civ. No. 75–133–1.

United States District Court, S. D. Iowa, C. D.

Jan. 20, 1976.

Robert C. Barnard, Charles F. Lettow (Cleary, Gottlieb, Steen & Hamilton), Washington, D. C., Herschel G. Langdon (Herrick, Langdon, Belin, Harris, Langdon & Helmick), Des Moines, Iowa, for plaintiff.

Michael Carlton, Atty., U. S. Dept. of Justice, Pamela Quinn, Atty., Environmental Protection Agency, Washington,

D. C., Allen L. Donielson, U. S. Atty. and Keith E. Uhl, Asst. U. S. Atty., S. D. of Iowa, Des Moines, Iowa, for defendant.

## MEMORANDUM OPINION AND ORDER

STUART, District Judge.

This matter came before the Court on cross motions for summary judgment. Oral arguments were presented to the Court on September 12, 1975. Parties have agreed that the hearing may be considered a complete submission on the merits. Appearances are noted in the Clerk's Court Minutes for that date. The plaintiffs are millers from the corn wet milling industry. The defendant is the Administrator of the Environmental Protection Agency (EPA). The issue for decision is whether the 1977 and 1983 effluent limitation guideline regulations published at 40 C.F.R. §§ 406.10–.13, for existing point sources in the corn wet milling subcategory of the grain mills point source category, promulgated pursuant to section 304(b) of the Federal Water Pollution Control Act Amendments of 1972 (the Act),[1] are within the bounds of the statutory scheme. This Court must decide whether the EPA has (1) exceeded its statutory authority or (2) has acted arbitrarily and capriciously in developing the effluent limitation guideline regulations for existing plants in the corn wet milling industry. The jurisdiction of this Court to entertain the action is established by the decision of the Court of Appeals in *CPC International Inc. v. Train* (8th Cir., 1975), 515 F.2d 1032.

After examining the briefs and other motion papers, as well as the administrative record and the legislative history, the Court holds that these effluent limitation guideline regulations are, in some respects, improper. The Court will thus grant plaintiffs' motion for summary judgment and deny the defendant's motion. The remainder of this memorandum will outline the standard of review, detail the statutory and administrative scheme, and then discuss the shortcomings of EPA's guidelines.

1. *The Standard of Review.*

The EPA states that the guidelines at issue were developed during the course of informal rule making. Both EPA and the plaintiffs agree that this Court's power to review the guidelines is governed by Section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706(2), which provides in part:

[T]he reviewing court shall—

\* \* \* \* \* \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

\* \* \* \* \* \*

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

\* \* \* \* \* \*

In supplying a judicial gloss to this statutory standard, the Supreme Court has stated:

Under the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court must "consider whether the decision was based on a consideration of the relevant facts and whether there has been a clear error of judgment \* \* \*. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe,* supra, 401 U.S. [402,] at 416, [91 S.Ct. 814, at 824, 28 L.Ed.2d 136] [(1971)]. The agency must articulate a "rational connection between the facts found and the choice made."

---

1. Citations will be to the Act itself and not the codification. The Act is codified at 33 U.S.C. § 1251 *et seq.* (Supp. III, 1973).

*Burlington Truck Lines v. United States,* 371 U.S. 156, 168 [83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)]. While we may not supply a reasoned basis for the agency's action that the agency itself has not given, *SEC v. Chenery Corp.,* 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)], we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 595 [65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945)].

*Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.* (1974), 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447. See also, *CPC International Inc. v. Train,* supra, at 1043–44; and *Texas v. EPA* (5th Cir., 1974), 499 F.2d 289, 297.

The Court has examined the guidelines and the administrative record to discover, not only the EPA's conclusions, but also the reasoning upon which the Agency relied in reaching those conclusions. This inquiry has been made more difficult by the fact that the administrative record is voluminous and is not well organized.

### 2. The Statutory Scheme.

Although the Court of Appeals in *CPC International Inc. v. Train,* supra, gave a rather full description and analysis of the statutory scheme involved, the Court believes this opinion will be more meaningful if the salient features of the Act are set out.

The Act states that "it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985". Section 101(a)(1). The Act also states that the discharge of any pollutant is unlawful if the conditions or requirements of the Act have not been met. Section 301(a).

Section 301(b) of the Act provides:

In order to carry out the objective of this Act there shall be achieved—

(1)(A) not later than July 1, 1977, effluent limitations for point sources, * * * which shall require the application of the best practicable control technology currently available as defined by the Administrator pursuant to section 304(b) * * *.

* * * * * *

(2)(A) not later than July 1, 1983, effluent limitations for categories and classes of point sources, * * * which * * * shall require application of the best available technology economically achievable for such category or class, which will result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants, as determined in accordance with regulations issued by the Administrator pursuant to section 304(b)(2) * * *.

Section 306(a)(3) defines "source" as "any building, structure, facility, or installation from which there is or may be the discharge of pollutants".

This provision, then, provides the objectives for existing point sources. The concepts of "best practicable control technology currently available", and "best available technology economically achievable" are to be operationalized or, as the Court of Appeals stated, "given content" through the publication of regulations pursuant to section 304(b).[2]

---

2. Section 304(b) provides:

For the purpose of adopting or revising effluent limitations under this Act the Administrator shall, * * * publish within one year of enactment of this title [October 18, 1972] regulations, providing guidelines for effluent limitations and, at least annually thereafter, revise, if appropriate, such regulations. Such regulations shall—

(1)(A) identify, in terms of amounts of constituents and chemical, physical, and biological characteristics of pollutants, the degree of effluent reduction attainable through the application of the best practicable control technology currently available for classes and categories of point sources * * *; and

(B) specify factors to be taken into account in determining the control measures and practices to be applicable to point sources * * * within such categories or classes. Factors relating to the assessment of best practicable control technology currently available to comply with subsection (b)(1) of section 301 * *

This section, then, is the source of the guideline regulations which are being attacked in this action. For existing sources, section 301(b) of the Act requires by 1977 the application of the "best practicable control technology currently available", and by 1983, the application of the "best available technology economically achievable". In section 304(b) of the Act, the Congress attempts to provide a general outline or framework for the Administrator to use in defining these two technologies. The guideline regulations are in turn to be used by permit-issuing authorities, which may be either EPA or the appropriate EPA-approved state agency, in issuing individual permits pursuant to section 402 of the Act. This aspect of the Act establishes what has been called "a primary means * * * for achieving the effluent limitations by the deadlines contained in section 301(b) * * *". *Natural Resources Defense Council, Inc. v. Train* (1975), 166 U.S.App.D.C. 312, 510 F.2d 692, 696. The role of the states in achieving the goals of the Act is obviously important under this system of permits, even though the EPA is given review authority over state-issued permits. The Court at this time feels called upon to commend the EPA for the manner in which they have performed a monumental task in a relatively short time.

### 3. *The Regulatory Scheme.*

█ Upon enactment of the statute, EPA promptly set out to work Congress' will. The product of this effort, for the purposes of this suit, is the effluent limitation guidelines published at 40 C.F.R. § 406.10 *et seq.* At the outset, it should be recognized that the EPA divided the category grain mills, section 306(b)(1)(A), into six subcategories, only one of which is corn wet milling. See Development Document at 37–9. The Court is of the opinion that this was a rational and reasonable breakdown.

Section 406.12 of the guidelines sets forth the effluent limitation guidelines for existing point sources in the corn wet milling subcategory with respect to the 1977 goals (the best practicable control technology currently available). The regulation first sketches the rough methodology by which EPA arrived at the limitations, and then provides a procedure to be followed if a certain plant believed its situation to involve "fundamentally different" factors.[3]

shall include consideration of the total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application, and shall also take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate;

(2)(A) identify, in terms of amounts of constituents and chemical, physical, and biological characteristics of pollutants, the degree of effluent reduction attainable through the application of the best control measures and practices achievable , including treatment techniques, process and procedure innovations, operating methods, and other alternatives for classes and categories of point sources * * *; and

(B) specify factors to be taken into account in determining the best measures and practices available to comply with subsection (b)(2) of section 301 * * * to be applicable to any point source * * * within such cat-

egories or classes. Factors relating to the assessment of best available technology shall take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, the cost of achieving such effluent reduction, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate * * *.

**3.** That section provides in part:

(a) In establishing the limitations set forth in this section, EPA took into account all information it was able to collect, develop and solicit with respect to factors (such as age and size of plant, raw materials, manufacturing processes, products produced, treatment technology available, energy requirements and costs) which can affect the industry subcategorization and effluent levels established. It is, however, possible that data which would affect these limitations have not been available and, as a result, these limitations should be adjusted for certain plants in this industry.

Section 406.12 then sets forth, in tabular form, the 1977 limitations which are to govern each point source within the corn wet mills subcategory of the grain mills category:

(b) The following limitations establish the quantity or quality of pollutants or pollutant properties, controlled by this section, which may be discharged by a point source subject to the provisions of this subpart after application of the best practicable control technology currently available:

Effluent limitations

| Effluent characteristic | Maximum for any 1 day | Average of daily values for 30 consecutive days shall not exceed— |
|---|---|---|
| | Metric units (kilograms per 1,000 kg of corn) | |
| BOD5 _____ | 2.67 | 0.89 |
| TSS _____ | 2.67 | .89 |
| pH _____Within the range 6.0 to 9.0. | | |
| | English units (pounds per 1,000 stdbu of corn) | |
| BOD5 _____ | 150 | 50 |
| TSS _____ | 150 | 50 |
| pH _____Within the range 6.0 to 9.0. | | |

Most of the table is self-explanatory; however, the following definitions give some help in interpreting the table. "Biochemical oxygen demand (BOD) is a measure of the oxygen consuming capabilities of organic matter. The BOD does not in itself cause direct harm to a water system, but it does exert an indirect effect by depressing the oxygen content of the water." Development Document at 67. Thus, BOD5 measures the "biodegradability of organic matter in waste water" over a five-day period. *Id.* at 68.

TSS is a measure of total suspended or undissolved solid matter found in waste water, and includes "both organic and inorganic materials". *Id.*

An individual discharger or other interested person may submit evidence to the Regional Administrator (or to the State, if the State has the authority to issue NPDES permits) that factors relating to the equipment or facilities involved, the process applied, or other such factors related to such discharger are fundamentally different from the factors considered in the establishment of the guidelines. On the basis of such evidence or other available information, the Regional Administrator (or the State) will make a written finding that such factors are or are not fundamentally different for that facility compared to those specified in the Development Document. If such fundamentally different factors are found to exist, the Regional Administrator (or the State) shall establish for the discharger effluent limitations in the NPDES permit either more or less stringent than the limitations established herein, to the extent dictated by such fundamentally different factors. Such limitations must be approved by the Administrator of the Environmental Protection Agency. The Administrator may approve or disapprove such limitations, specify other limitations, or initiate proceedings to revise these regulations.

EPA explained the concept of pH in the following manner: "The term pH is a logarithmic expression of the concentration of hydrogen ions. At a pH of 7, the hydrogen and hydroxyl ion concentrates are essentially equal and the water is neutral." *Id.* at 69.

Section 406.13 states the effluent limitation guidelines for 1983, that is, the guidelines which provide for the application of the "best technology economically achievable":

The following limitations establish the quantity or quality of pollutants or pollutant properties, controlled by this section, which may be discharged by a point source subject to the provisions of this subpart after application of the best available technology economically achievable:

| Effluent characteristic | Effluent limitations | |
| --- | --- | --- |
| | Maximum for any 1 day | Average of daily values for 30 consecutive days shall not exceed— |
| Metric units (kilograms per 1,000 kg of corn) | | |
| BOD5 | 1.08 | 0.36 |
| TSS | .54 | .18 |
| pH | Within the range 6.0 to 9.0. | |
| English units (pound per 1,000 stdu of corn | | |
| BOD5 | 60 | 20 |
| TSS | 300 | 10 |
| pH | Within the range 6.0 to 9.0. | |

From the regulations themselves, and from counsel's comments at oral arguments, it is apparent that the Development Document plays a crucial role in defining any future implementation of the guidelines. Counsel for EPA stated that the Development Document would be the primary source material for the states to use in issuing the individual permits. The Court has examined the Development Document and will refer to it as necessary.

4. *Classes and Categories or Individual Point Sources.*

Plaintiff contends the guidelines for existing plants for 1977 and 1983 are invalid as a matter of law because: (1) they do not set out a range for possible effluent reduction and (2) they do not specify the factors to be utilized by the permit-issuing authorities in applying the technology to a given plant environment in order to set its limitations in issuing a permit for that plant.

EPA does not argue the guidelines meet these standards, but asserts that Congress did not intend to make the guidelines applicable to each individual point source. EPA argues the guidelines are to be as nearly as possible nationally uniform within each class or category of point sources. EPA claims it has provided "a range of discharge levels" by dividing the Grain Processing Segment of the Grain Mills Point Source Category

into six subcategories, including Corn Wet Milling. EPA also asserts that it satisfied the requirements of section 304(b) when it considered the factors in establishing the appropriate subcategories of the grain milling industry.

The issue is thus clearly drawn. The Court must determine whether Congress intended to apply the range and factors concepts to subcategories of industries or whether they were to be used in considering the permit for each individual point source.

■ Both sides to this litigation have pointed to certain passages of the legislative history to buttress their own particular interpretation of the statute. The legislative history is in some instances contradictory and inconsistent. However, as the defendant states, "the legislative history cannot be used to defeat the plain words of a statute". Defendant's brief at 58. Thus, the Court has examined the legislative history to determine the broad outlines of Congressional intent. That intent, must be determined in light of Congress's deeply felt concern over the quality of the nation's waterways and its recognition of the difficulty of the task and the importance of making the states important partners in this undertaking. Section 101. The Court has not attempted to reconcile its reading of the statute with every comment made about the statutory scheme by every Senator or Member of Congress.

The Court makes an exception with regard to a statement directly in point found on page 172 of Volume I of the Legislative History of the Act which is contained in a memorandum prepared by Senator Muskie as part of his remarks concerning the Conference Committee Report.

The Conferees intended that the factors described in section 304(b) be considered only within classes or categories of point sources and that such factors not be considered at the time of the application of an effluent limitation to an individual point source within such a category or class.

In the Law of Federal Water Pollution Control in Federal Environmental Law at 703 n. 98 (E. Dolgin & T. Guilbert ed), Robert V. Zener, EPA's General Counsel, in commenting on that precise statement said:

If this statement is authoritative then EPA would be precluded from leaving any discretion at the point of individual permit issuance, whether such a course was technically possible or not. However, as noted, the Conference Report requires only that the effluent limitations within any particular class or category of sources be 'as uniform as possible'. As we have previously discussed, statements of individual conferees that go farther than the Conference Report are dubious indications of congressional interest, since frequently such statements were made on the floor only because the individual conferee failed to get conference agreement to put the statement in the Report.

The Court agrees with the position taken by Mr. Zener at that time. The Court cannot in examining the statutory language find any way to interpret the act as suggested by Senator Muskie.

■ Section 304(b) requires EPA to publish regulations providing guidelines for effluent limitations. Section 304(b)(1)(A) requires EPA to [among other things not material] identify "the degree of effluent reduction attainable * * * *for classes and categories of point sources*". Section 304(b)(1)(B) requires EPA to "specify factors to be taken into account in determining the control measures and practices *to be applicable to point sources* * * * *within such categories or classes*". (Emphasis supplied)

The language is clear. It takes no construction to conclude that (A) applies to classes and categories of point sources and (B) applies to point sources within such categories or classes.

Further support for such conclusion comes from an analysis of the factors to be considered. All factors appear to be

directed toward individual point sources, while "the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes [and], non-water quality environmental impact" could not be applied to a whole class or category.

As the Court interprets the language of section 304(b), the guideline regulations to be promulgated by the EPA are meant to set forth two basic standards for both the 1977 and the 1983 technologies. First, the guidelines are to "identify * * * the degree of effluent reduction attainable through the application of the * * * technology * * *for classes and categories of point sources * * *". Section 304(b)(1)(A). (Emphasis supplied). The Congress has directed the EPA to determine for each class or category of point sources how much effluent reduction can be achieved through the application of the appropriate technology. Second, the guidelines should specify the factors which may be taken into account in determining, for each individual point source, the best measures to achieve the application of the relevant technology. Thus, the guideline regulations are to be two-pronged. They should state the effluent reduction possible for the entire class or category of point sources within a given range and they should also analyze those factors deemed important for the writing of an individual permit within that range.

■ The designation of a range of values and a listing of factors to be considered by the permit issuing authority is especially important in the corn wet milling industry.

The effluent limitation guidelines presented * * * can generally be applied to all plants in each grain milling category. Special circumstances in individual plants, however, may warrant careful evaluation, especially in corn wet milling.

Corn wet mills are, by their very nature, sophisticated chemical plants producing a variety of products. Raw waste characteristics are dependent on many factors, not the least of which is product mix. It must be emphasized that, even with the implementation of the in-plant controls detailed earlier in this section, some plants will not be able to reduce their raw waste load per unit of raw material to the same low levels achieved by other mills.

Development Document at 116.

There is evidence the quality of the waste water varies with the particular product that is being produced. Highly modified starches result in higher waste loads per unit of raw material. EPA recognized this fact but could not, on the available data, distinguish a "relationship between the raw waste characteristics from all the mills and their product mix * * *". Id. at 111. Individual plants vary in the percentage of highly modified starches produced and in each plant the product produced varies from day to day.

It is thus clear that the EPA recognizes that each plant in the corn wet milling industry is unique and that the application of identical technology will not lead to similar results. Although the EPA recognizes that corn wet mills deserve special consideration, it has not formulated a detailed approach for issuing individual permits. This decision to omit a detailed methodology is an arbitrary and capricious one.

From the point of view of a permit-issuer, the EPA approach is wholly unsatisfactory. For the most part, the permit issuing authority will be working with no clearly defined methodology in determining the application of the appropriate technology for each plant. The state agencies, subject to EPA approval, are to play an important role in cleaning the nation's waterways. But the product of the EPA does not allow the states to fulfill that role. The EPA's efforts have been almost solely directed at arriving at single-number guideline regulations. Application of these numerical values to each corn wet mill reduces the state agencies to mere conduits. If the Congress had desired to make the permit

issuing function only EPA's concern, it could have done so. But the Congress did not take this course. It set up a carefully defined program with responsibilities to the states. Section 101(b).

Congress, of course, is justifiably concerned with the uniform application of the standards throughout the nation to prevent industry from moving to a jurisdiction which is more lax in applying them. Guidelines can be drawn to give the permit issuers some discretion and still preserve uniformity. Uniformity is further assured by the fact that the Administrator has a right to object to the issuance of a permit by State authorities. Section 402(d).

The Court therefore holds that the EPA exceeded its statutory authority and acted arbitrarily and capriciously (1) by using a single number standard rather than a range of numbers for the wet corn milling industry and (2) in failing to specify the factors to be utilized by the permit issuing authorities in applying technology to a given plant environment in order to set its limitations.

5. *Single-number Guidelines.*

■ EPA guidelines for the corn wet milling industry for 1977 set BOD5 and TSS for any one day at 150 pounds per 1000 standard bushel of corn and 50 pounds per 1000 standard bushel of corn average of daily values for 30 consecutive days. Plaintiff claims that in addition to not providing a range, the single-number value is arbitrary and capricious and not supported by the record.

The plaintiffs went through an elaborate process in speculating how the EPA arrived at their numerical standards. Apparently the plaintiffs started with the final numbers and then worked backwards. This led to a rather complicated, and generally non-explanatory, mathematical process. At oral argument, counsel for EPA stated that the reason that the plaintiffs have had so much trouble is that they started at the wrong place. Instead of starting with the result, counsel stated that to understand the final guidelines one should

start with the standard goal of 30 milligrams per liter of waste water. Thus, at oral argument, Ms. Quinn stated:

(S)econdary treatment * * * was a starting point. Secondary treatment is what is applied to domestic sewage. City systems use biological treatment systems, and secondary treatment is kind of a description of how this is to perform. 30 milligrams per liter is a number that applies to secondary treatment. * * * That is the standard set for municipal treatment facilities. It is 30 milligrams per liter for BOD and Suspended Solids. The number that was the goal number of 30 milligrams per liter, that was selected as the goal for this industry, was not just drawn out of the air.

Transcript of oral argument at 69. See also, Development Document at 77.

Although the Court accepts counsel's statement that this standard was not "drawn out of the air", the Court has not been able to determine on what basis the EPA decided that an appropriate goal for municipal treatment facilities should also apply to the corn wet milling industry. Indeed, the EPA itself recognizes that corn wet mills are "large chemical complexes", Development Document at 41, and "sophisticated chemical plants * * *". *Id.* at 116. The Court has not been able to discover data in this record which would justify applying the same standards to admittedly complex chemical plants which are applied to municipal treatment facilities.

There is evidence that the industrial waste from the corn wet milling industry is subject to "heavily bulking sludge" and "shock loads" which seriously effect the efficiency of the treatment plants. This condition makes it difficult to justify a maximum load of only three times the 30 day average, particularly when there is no provision for statistically expected excursions. This would mean that the plants could, unavoidably, be in violation of the law on certain occasions throughout the year.

It is, of course, possible that the standard chosen by the EPA would be an

entirely appropriate standard if included in a range of numbers. However, the Court has not been able to discern any basis in the record for making this determination. This failure to articulate the basis for the regulations leads the Court to conclude that the regulations are invalid in this respect. Unless a reviewing Court can determine the appropriateness of the agency's base level decisions, it is impossible to determine whether the agency has acted properly. This is not to say that an agency must plan its work so that non-technical minded lay people, that is, the judiciary, must understand all that the agency does. As the Court of Appeals for the District of Columbia has stated: "We are keenly aware of the need to avoid procedural strait jackets that would seriously hinder this new agency in the discharge of the novel, sensitive and formidable, tasks entrusted to it by Congress." *Kennecott Copper Corp. v. EPA* (1972), 149 U.S.App.D.C. 231, 462 F.2d 846, 849.

It is thus the Court's conclusion that the EPA failed to provide a proper record for its decision that the same waste water treatment goals that apply to municipal treatment facilities should also apply to the corn wet milling industry. Given the recognized differences between the two types of facilities, the Court must hold that the decision on the daily and 30 day limits lacks support in the record and was therefore arbitrary and capricious. The EPA should either furnish documentation supporting the inclusion of its single number limitation in a range of numbers or change the range to one which can be supported.

### 6. *1971 Cost Figures.*

■ EPA used August 1971 costs in figuring the cost of implementing the suggested best practicable control technology currently available. It recognizes the shortcomings of the use of such outdated figures. The Eighth Circuit in remanding the regulation for new sources to EPA required them to use more current figures in its costs computation. *CPC International Inc. v. Train,* supra, at 1051. As these regulations for existing sources must also be remanded, the most current cost figures available should be used and should be updated upon the best information available.

### 7. *In-plant Controls.*

■ Plaintiff argues that the Act does not authorize EPA to base its 1977 upon replacement of barometric condensers or to require extensive in-plant changes to the water usage and cooling system of a corn wet mill.

The Court does not read the regulations as requiring the replacement of barometric condensers with surface condensers by 1977. All that is required is the recirculation of barometric cooling waters over cooling towers. In the Court's opinion, the installation of cooling towers is not a "control technology within the manufacturing process" itself and is not prohibited by the Act.

The other in-plant pollution controls mentioned in the Development Document do not represent changes in the basis manufacturing process. EPA recognizes changes in in-plant practices must be carefully considered before incorporating them into 1977 standards. In-plant changes can be evaluated during the review of the factors which the permit issuers is to take into consideration in setting the effluent limits within the range established by EPA.

### 8. *1983 Guidelines.*

■ The guideline regulations for 1983 must be held invalid because the EPA has not demonstrated that the technology upon which the regulations are predicated has been shown to be available. This result is mandated by the decision of the Court of Appeals in *CPC International Inc. v. Train,* supra. The Court of Appeals reviewed the new source standards and not the guideline regulations for existing point sources. However, the Court noted that the new source standards "are identical to the 1983 guidelines for existing plants". *Id.* at 1045. The Court also stated that these 1983 guidelines "are predicated on the availa-

bility of the 1977 technology plus the addition of deep bed filtration". *Id.* After thoroughly analyzing the record, the Court of Appeals concluded "that the prediction as to the efficacy of deep bed filtration in the corn wet milling industry is not a reasonable one, because there is no support in the record for that prediction". *Id.* at 1049. This Court must follow the holding of the Court of Appeals. The 1983 guideline regulations, predicated as they are upon deep bed filtration, are invalid.

The Court has considered all other arguments advanced by plaintiff and rejects them. While the regulations could be improved in many of the areas suggested, the EPA has done a remarkably thorough job with a monumental task, if this one segment of one industry is an example. Provision is made for yearly revision of the guidelines and if experience reveals some fatal defects not now apparent, they can be corrected. It may have been that closer cooperation of the industry as a whole with EPA would have proved a benefit to all concerned.

9. *Remedy.*

 The plaintiffs have requested that the Court hold the guideline regulations invalid and remand them to the EPA for further development and documentation. The Court has so held and thus grants plaintiffs' motion for summary judgment. Following the Court of Appeals, the Court remands this cause to the Agency for further action to be conducted in accordance with the requirements of the Act, "except that the time periods shall be shortened so as to permit the EPA to enter its final order * * * within 120 days". *CPC International Inc. v. Train, supra,* at 1050. This Court will retain jurisdiction over the cause pending further agency action. After EPA finishes its work, the plaintiffs shall have ten days to file objections. This procedure should allow the EPA sufficient time to overcome the shortcomings in the regulations and still move the nation towards the goal of clean water.

It is therefore ordered that the plaintiffs' motion for summary judgment be, and hereby is, granted.