**UNITED STATES of America**

v.

**WEST PENN POWER COMPANY.**

**Civ. A. No. 77–1142.**

United States District Court,
W. D. Pennsylvania.

Aug. 21, 1978.

As Amended Oct. 2, 1978.

Craig McKay, Pittsburgh, Pa., John E. Varnum, Dept. of Justice, Washington, D. C., for plaintiff.

Harold R. Schmidt, Pittsburgh, Pa., for defendant.

MEMORANDUM OPINION AND ADJUDICATION: APPLICATIONS FOR PRELIMINARY INJUNCTIONS

KNOX, District Judge.

A.  STATEMENT OF THE CASE

The United States has filed a complaint against West Penn Power Company a subsidiary of Allegheny Power System, Inc. alleging that the defendant has been emitting sulphur dioxide from its Mitchell station Unit No. 3 (Boiler No. 33) in violation of the Clean Air Act (now renumbered 42 U.S.C. § 7401, et seq.). The complaint alleges that the defendant has been in vio-

lation of the Clean Air Act continuously since September 1973 and pursuant to § 113(b) of the Act (now 42 U.S.C. § 7413(b)) seeks a preliminary injunction to restrain defendants from continuing to violate the act and to require defendant to comply with the applicable sulphur dioxide emission limitations, "as expeditiously as practicable". It also asks the court to impose civil penalties of a maximum of $25,-000 per day against the defendant pursuant to the provisions of the said § 113(b) for each day of violation after August 7, 1977, the effective date of the Clean Air Amendments of 1977, which amended § 113(b) to provide for civil penalties.

Plaintiff filed a motion for preliminary injunction and defendant filed a counterclaim and also a motion for a preliminary injunction claiming it had been denied due process by the government's pursuit of this enforcement action while it was challenging denial of a variance request pending in the state agencies. The counterclaim seeks to enjoin the Environmental Protection Agency EPA from enforcing the Clean Air Act against the defendant. We hold that defendant has not been deprived of due process of law in the application to its Mitchell Power Station of the provisions of the Pennsylvania Implementation Plan. Hearings were held on the applications for preliminary injunction on October 11, 27, and 28, 1977, November 21, 22 and 23, 1977 and February 6, 7, 8 and 9, and 10, 1978, a total of eleven days. At these hearings a great mass of technical and expert testimony was introduced with respect to the alleged violations at the Mitchell Plant and the defendant's defenses to the charges.

It should also be noted that on December 8, 1977, the defendant filed a petition for emergency relief as a result of the emergency situation developing from the coal strike by United Mine Workers which persisted from December 1, 1977, until late March 1978.

The relief granted was to the effect that the defendant could resume operations of Boiler No. 33 at the Mitchell Plant during the national emergency occasioned by the coal strike subject to a fine of not to exceed $500 per day. The defendant had shut down Boiler No. 33 following institution of this suit with the approval of the Pennsylvania Public Utility Commission (PUC).

Ten days after the coal strike ended the boiler was again shut down and has remained shut down by the voluntary act of the defendant who chose to discontinue its use rather than run the risk of penalties of $25,000 per day. We are not informed whether this is approved by the PUC.

Both sides have filed voluminous requests for findings of fact and conclusions of law and almost weekly have filed supplemental memoranda calling the court's attention to subsequent court and/or administrative decisions in this area which is rapidly developing.

The court makes the following

## B. FINDINGS OF FACT

### A. West Penn Has Been Violating the Pennsylvania Implementation Plan

1. West Penn is a Pennsylvania corporation which provides electric service to approximately 500,000 customers in southwestern, south central, and north central portions of Pennsylvania. It is a wholly owned subsidiary of Allegheny Power System, Inc.

2. West Penn operates the Mitchell Power Station, a fossil fired electric generating facility located in Courtney, Union Township, Washington County, Pennsylvania.

3. The station consists of three generating units. Two of these units (Nos. 1 and 2) are relatively small units of 89 megawatts each and are collectively fired by three combustion units (Boilers No. 1, 2 and 3). Each of these three boilers burns No. 6 fuel oil and is in compliance with all applicable emission limitations. They were converted from coal to oil to meet air pollution control requirements.

The third generating unit, No. 3 is a larger unit with a rated capacity of 291 megawatts, and is fired by Boiler No. 33. Boiler No. 33 has a rated heat input of $2546.6 \times 106$ BTU per hour and burns bitu-

minous high sulfur coal with an average sulfur content of 2.7%. (P. Ex. 9 and ¶ 11 of complaint admitted by West Penn.)

4. West Penn's Mitchell Station is the second largest emitter of sulfur dioxide in Allegheny county and its close environs. Unit No. 3 alone is the fourth largest emitter of sulfur dioxide in that area.

5. On May 31, 1972, at 37 Fed.Reg. 19842 et seq. (40 CFR § 52.2020 et seq.) the Administrator of the EPA approved in relevant part a State Implementation Plan (hereinafter SIP) for the Commonwealth of Pennsylvania, pursuant to § 110(a)(2) of the Act 42 U.S.C. § 1857c–5(a)(2), recodified at 42 U.S.C. § 7410(a)(2) (1977). The SIP included various regulations of the Pennsylvania Department of Environmental Resources (hereinafter DER) governing the control of air pollution. Pennsylvania DER Rules and Regulations § 123.22(b), approved by the Administrator of EPA as a part of the Pennsylvania SIP, govern the emission of sulfur oxides expressed as $SO_2$, from combustion units located in the Monongahela Valley Air Basin. Defendant's Mitchell Station is located in the Monongahela Valley Air Basin as defined in Pennsylvania DER Rules and Regulations § 121.1(24), also approved by the Administrator of EPA. Tr. 91–92.

6. Under the Pennsylvania SIP (DER Rules and Regulations § 123.22(b)(2)(iii)), West Penn's Mitchell Power Station Unit No. 3 may not at any time emit sulfur dioxide in excess of .6 pounds per million BTU.

7. West Penn offered testimony that if Boiler No. 33 burned 1.9% sulfur coal and emitted through a proposed 750 foot stack "Tall stack" emissions from Boiler No. 33 would not interfere with the attainment and maintenance of national ambient air quality standards. (Tr. 1077; 1068–1078). The court finds this does not comply with the emission control regulations.

8. In August 1973 EPA requested information from West Penn on the operation of its Mitchell Station (under the authority granted by § 114 of the Clean Air Act). West Penn furnished EPA with the requested information in early September 1973. See P. Ex. 1 and 2.

9. After review of this information, the Regional Administrator of EPA, Region III, in Philadelphia, found that Mitchell Station Unit No. 3 was emitting sulfur oxides in excess of the limit permitted by the Pennsylvania Implementation Plan and issued on September 13, 1973, a notice of violation to West Penn under § 113(a)(1) of the Clean Air Act, 42 U.S.C. § 1857c–8(a)(1), recodified at 42 U.S.C. § 7413(a)(1). The evidence shows that West Penn was emitting sulfur dioxide from Mitchell Station Unit No. 3 at a rate of approximately 3.38 pounds per million BTU of heat input at that time. P. Ex. 3; Tr. 96.

10. By order of the DER dated September 19, 1973, a variance for Boiler No. 33 was granted. However, conditions in the variance granted were unacceptable to West Penn, to wit, West Penn was ordered to complete construction of a scrubber on Boiler No. 33 by June 1, 1976. (D. Ex. A. 3).

11. The uncontroverted testimony of Mr. Abraham Ferdas, senior air compliance engineer for EPA, showed that subsequently, West Penn's emissions from Mitchell Station Unit No. 3 were 3.16 pounds of sulfur dioxide per million BTU heat input in June 1974, 4.21 pounds of sulfur dioxide per million BTU heat input in January 1976, and 4.51 pounds of sulfur dioxide per million BTU heat input in June 1976. (Tr. 104, 113; P. Ex. 7 and 10). There is no evidence that Mitchell Station Unit No. 3, when operating, emits sulfur dioxide at a rate of .6 pounds per million BTU heat input or less at any time.

B. The Relief Requested by the United States Is Reasonable and Effective

1. The installation of a Scrubber at Mitchell Station Unit No. 3 is Technologically Feasible.

a. West Penn has three options to meet the Pennsylvania sulfur dioxide emission limitation for Boiler No. 33 of .6 pounds per million BTU heat input. Those alternatives are:

(a) burning low sulfur coal that would meet the emission limitation (i. e., .4% sulfur coal with a heat content of 13,000 BTU/pounds);

(b) removing the sulfur from the coal presently being used at the unit before burning it; and

(c) using the present coal source and installing a scrubber (G. Ex. 11, p. vii, Tr. 124, 125).

The low sulfur coal alternative is not practical for West Penn to undertake. Currently, no producers are guaranteeing a sulfur content for their coal much below 1% sulfur. Moreover, the purchase of .4% sulfur coal, if it were available, would be very expensive and would require extensive alterations to Boiler No. 33 in order to burn coal with that low a sulfur content. G. Ex. 11, p. vii; Tr. 125, 205, 208–212, 964. Neither is coal cleaning prior to burning a viable alternative at the present time. Only 10% of the present coal could be desulfurized for use at the plant, while the remaining 90% would have to be discarded, with today's infant coal cleaning technology. Here, again, the costs would be very high, estimated at $95 million annually. G. Ex. 11, p. viii, Tr. 213–218, 965.

The third option—installation of a flue gas desulfurization (FGD) system on Boiler No. 33—is a reliable, effective method for meeting the requirements of the Pennsylvania Implementation Plan and is by far the least expensive of the alternatives open to West Penn. G. Ex. 11, p. viii; Tr. 124–139. The capital costs of a lime scrubber, limestone scrubber and magnesium oxide scrubber are $34.9 million, $37.2 million, and $56.1 million, respectively. G. Ex. 11, pp. 3–16—3–23; Tr. 147–157, 235–237, 414–433.

b. The court finds that it is technologically feasible for West Penn to install a reliable scrubber on Boiler No. 33 to remove enough sulfur dioxide from the flue gas to meet the Pennsylvania emission limitation in 36 months. A removal efficiency of approximately 86% would be required assuming continued used of West Penn's current coal sources. G. Ex. 11; Tr. 126, 130–131, 138. West Penn does not dispute that a scrubber can be designed to remove 86% of the sulfur dioxide from the flue gas at Mitchell Station Unit No. 3. Tr. 792, 916, 937.

(1) FGD processes are grouped into two basic categories, regenerable or nonregenerable, based on whether the sulfur is separated from the absorbent as a by product or discarded along with the absorbent as a by product or discarded along with the absorbent as waste. Nonregenerable processes, such as lime, limestone, and sodium carbonate FGD processes, produce a sludge that requires disposal in an environmentally sound manner. Regenerable processes, such as the magnesium oxide process, include additional steps to process the sulfur into by products such as sulfuric acid or elemental sulfur. G. Ex. 12, pp. 3–1—3–22. These by-products may be marketable.

(2) The development of scrubber technology since its inception in 1926 in Britain has not been an entirely smooth road. However, all of the major mechanical problems earlier experienced, such as erosion, corrosion, scaling and plugging, have in large measure been solved. G. Ex. 12, pp. 3–8, 3–15, 3–21, 3–24, Tr. 120–139, 165–167.

(3) As of April, 1977, sixteen major utilities are operating 24 scrubbers on their boilers. G. Ex. 12, p. 3–5. As of the same date, 33 additional FGD systems were under construction and 27 are scheduled for start up before the end of the year. Also, contracts have been awarded for another 18 FGD systems. Sixteen of these systems are planned for start up before or during 1980. Finally, 23 utilities have stated that they plan to install 44 FGD systems with start up dates as early as 1980. G. Ex. 12, pp. 4–6; Tr. 135–137. As of the date of PEDCo report, over 50 utilities are operating, constructing or planning to install FGD systems. G. Ex. 12, p. 4–1. William Cress, West Penn's monitor of scrubber development, stated he was aware that 2 other utilities had committed to construct scrubbers since the completion of the PEDCo report. Tr. 962.

(4) Moreover, there are a number of scrubber installations in the immediate vicinity of the Mitchell Station. West Penn's neighbor Duquesne Light Company is oper-

ating FGD systems on its Phillips and Elrama Power Stations, Tr. 120–139. Pennsylvania Power Company is operating on FGD system on its Bruce Mansfield Unit No. 1, is in the process of constructing another scrubber on Unit No. 2 at the station, and has already awarded the contract for the construction of a scrubber on Unit No. 3. G. Ex. 12, pp. 4-5, 4–7. The Mansfield Power plant has attained emissions below the .6 emission limitation and the Elrama and Phillips power plants are planning to do so this year. Tr. 126–138, 526, 793–794, 982–983. In addition, Philadelphia Electric Company is also employing a scrubber on its Eddystone Station Unit No. 1A and has announced plans to install two more scrubbers on Unit Nos. 1B and 2 at the station. The same utility has stated that it will install a scrubber on its Crosby Power Station with a start up date of 1980. G. Ex. 12.

(5) West Penn itself is installing a lime scrubber on its new Pleasants Station in Belmont, West Virginia. Tr. 133, 134, 914, 915, 989, 990. The scrubber on Unit No. 1 is planned to be at full operation next year, with the second unit to come on line in 1980. G. Ex. 12, p. 4–5, Tr. 133, 134. Moreover, West Penn is planning to invest approximately one billion dollars (Tr. 980, 981) to construct a new power station in Armstrong County, Pennsylvania, consisting of three 630-megawatt units to be finished during the years 1983, 1984 and 1985. Tr. 943–946. William Cress Manager of Engineering studies for defendant's parent stated that a FGD system will be installed on all three units. Tr. 943–946. He testified that bids for both lime and limestone will be sought from vendors. Tr. 946.

(6) Mr. Archie Slack was West Penn's proffered expert on scrubber technology. Mr. Slack the court finds is a leading industry spokesman against the installation of scrubbers. Tr. 769–771. He has testified at numerous hearings and conferences on behalf of utilities, always against FGD technology. Tr. 769–771. He has testified against FGD systems on behalf of several companies, such as Texas Utilities Company, the Arizona Public Service, Commonwealth Edison and the Tennessee Valley Authority (Tr. 770), which have since chosen to disregard his testimony, for they are either operating scrubbers or have them under construction. G. Ex. 12, pp. 4–1—4–6. The weight to be given to Mr. Slack's testimony is most questionable, particularly in view of his demand that a scrubber operate to perfection 100% of the time.

(7) Critical to his testimony is Mr. Slack's definition of a reliable scrubber: a scrubber is reliable enough to control sulfur dioxide from a power plant only if it is operational 100% of the time. Tr. 773–777, 787–788. In his view, a scrubber is nothing more than a "parasite" (Tr. 774), and cannot be considered reliable if it ever interferes with the power generating facilities of a plant. Tr. 773–777. In contrast, he regarded 75 to 80 percent reliability of a boiler as "good". Tr. 772. This standard of perfection is, of course, an impossible standard to meet for any man made equipment and must be rejected.

(8) The testimony of Mr. Cress is in the same category. He also believes that scrubbers are technologically infeasible by reason of their inability to achieve perfection. He stated repeatedly that no reliability short of 100% would satisfy him. Tr. 952, 953, 955. He testified that he would never recommend the installation of a scrubber at the Mitchell Station until 100% reliability were proven (Tr. 955) although he admitted that the combined reliability of the boiler and turbine at the Mitchell Station were only 98%.[1] Tr. 978, 979.

(9) Mr. Cress' view of scrubbers may not be shared by the engineers at West Penn who have to deal with such equipment on a daily basis. For example, in November 1976, Mr. Chaplin, who was in charge of investigating FGD technology for West Penn in connection with its lower Armstrong County Power project, found that lime and limestone FGD systems were reportedly performing "reliably" and "if the bids were open for a scrubber today for an in-service date in 3 to 4 years, these

---

1. It was proven that the actual reliability of the boiler alone is even lower, 78.9%. Tr. 385–386.

processes would be the leading contenders. They are the most advanced in technology, hardware and offer the best chance for reliable service". G. Ex. 22; Tr. 1003–1005.

(10) The reliability of FGD systems was examined by Congress in drafting the Clean Air Amendments of 1977, which became law on August 7, 1977. The House Report on the Amendments (published May 12, 1977) concluded that the installation of FGD systems is a most effective and reliable means of controlling sulfur dioxide emissions from utilities seeking to use the nation's huge coal reserves.

(11) The evidence does show that scrubbers have not been a 100% success and there are continuing serious problems such as scaling, plugging, erosion and corrosion but Congress did not intend that difficulties such as this would stop the Clean Air Program and instead relied on forced technology.

c. The court finds that a construction schedule of 36 months to install an FGD system is reasonable, given the large construction effort required. G. Ex. 11, pp. 3–24, 3–25; Tr. 130. This schedule includes the initial system selection to testing, debugging, and commissioning the system. Tr. 134, 135, 139.

All three vendors that have been solicited by West Penn to submit construction schedules have assured that the work can be done within 32 to 37 months. G. Ex. 17, 18 and 19, Tr. 885, 924–943. In fact, all vendors have represented that the work schedule can be shortened by 5 months if an expediated schedule is selected. Tr. 930.

d. The court finds that the installation of a scrubber at the Mitchell Station would be a difficult retrofit because the plant occupies a narrow piece of land. The court finds however that it is reasonably possible and defendant can solve the problem upon proper study. G. Ex. 11, Tr. 131, 241–250, 338–341.

(1) West Penn witnesses Archie Slack and William Cress refused to testify that a scrubber could not physically be installed at the site. They only objected to the fact that the installation would be "tight". Tr. 805, 973, 4, 924–938, 943.

(2) Strong proof that a scrubber can be installed at the Mitchell site are the statements of Babcock & Wilcox, Combustion Engineering and Universal Oil Products which were contracted to determine the feasibility of installing a system at the Mitchell Station. Tr. 924, 5. These vendors stated without reservation that a FGD system could be constructed at the Mitchell plant. G. Ex. 17, 18, 19; Tr. 935–937.

e. The court finds that the disposal of wastes from a scrubber at the Mitchell Station will present no insurmountable problems to West Penn. G. Ex. 11; Tr. 120–139.

(1) The end product of a nonregenerable scrubber is sludge, while the end product of a regenerable system is sulfuric acid. If a regenerable magnesium oxide system were installed on Boiler No. 33, a market would have to be found for sulfuric acid. G. Ex. 11, pp. 3–13, 14. There is today a market for sulfuric acid (Tr. 376, 7) and the acid can be used to make useful by products, G. Ex. 11, p. 3–13; Tr. 375, 6. If a nonregenerable lime or limestone scrubber were selected, West Penn would have the option of either trucking or pumping the sludge to a landfill such as its existing fly ash disposal site or removing the same by barge via the Monongahela River. Ex. 11, p. 3–13; Tr. 131–133, 342–348, 367, 8.

(2) The disposal of sludge from the plant is a task being successfully carried out by everyone of the utilities employing a lime or limestone FGD system, including neighboring Duquesne Light Company and Pennsylvania Power Company. The court finds that disposal of sludge from a scrubber does present difficult problems but is reasonably possible and defendant can solve these problems upon proper study.

(3) The installation of a nonregenerable scrubber on Boiler No. 33 would result in the production of 26.4 tons per hour of sludge having a consistency not unlike soft ice cream (Tr. 352, 423) or quicksand. Tr. 743.

(4) Accordingly, it appears that Mitchell site restrictions foreclose that location as disposal area. Tr. 132.

(5) If the current ash disposal site, consisting of 83 acres of hilly land (Tr. 574), were required to accommodate scrubber sludge, its present life would be reduced from 30 to 10 years (Tr. 132).

(6) Not only has PEDCo not determined whether local contractors could haul 500 truckloads of these materials per week, PEDCo also did not take into account the fact that the same 500 trucks would have to cross a main rail line currently used by the Penn Central Railroad and carrying anywhere from 4 to 8 trains per day (Tr. 572; 594). In addition, the roads between Mitchell and the current ash disposal site are heavily trafficked already (Tr. 573).

(7) Mr. Cress testified on direct examination that if 400 to 500 trucks per week were entering and exiting from Mitchell with lime or limestone and scrubber sludge in addition to the 115 fly ash trucks currently operating per week (Tr. 576), trucks would be leaving the plant approximately every two minutes and sometimes as often as every minute or minute and a half. (Tr. 872, 3).

(8) Citizen ire reached the level where residents have twice blockaded ash trucks and filed legal action against West Penn. Tr. 577; 581; West Penn. Ex. N–V. Mitchell Station manager Appel testified that, based upon his personal familiarity with citizen dissatisfaction, residents along the route from Mitchell to the ash site would not tolerate any substantial increase in West Penn truck traffic. Tr. 590.

f. The court finds that West Penn's assertion that obtaining a solid waste permit from the state will be a serious obstacle to scrubber sludge disposal is without substance if proper study is given to the problem including the means of transportation and disposal and the use of a magnesium oxide scrubber.

2. The Installation of a Scrubber at Mitchell Station Unit No. 3 Is Economically Feasible.

a. The court finds that Allegheny Power System and West Penn have the financing capability to install a scrubber in Mitchell Station Unit No. 3 and still remain economically sound, and that West Penn's assertion that the cost of a scrubber installation on that unit is economically infeasible for it to bear is not true.

b. The court finds that the installation of a scrubber at Mitchell Station Unit No. 3 requiring capital expenditures of between $35 and $60 million, depending on the type of scrubber selected, would be a rational economic decision for West Penn to make in order to comply with the Pennsylvania SIP.

c. The court's findings of these ultimate facts are based on these findings:

(1) West Penn Power Company and Allegheny Power System, Inc., are financially strong. West Penn, with an AA bond rating from Moody's Investors Service, has ready access to bond markets for raising capital in the future, and can raise the necessary capital for installation of a scrubber without jeopardizing its ability to issue more bonds in the future or its AA bond rating. Allegheny Power System, the parent holding company is also a financially solid corporation and could raise capital needed for installation of a scrubber.

(2) The annual costs will run from $15 million to $20 million per year subject to further inflation resulting from delays occasioned by this litigation.

(3) The rate increases to customers of West Penn would be small if West Penn were to install a scrubber costing between $35 and $60 million. In 1982 average customer charges would be increased 2.6% if a lime scrubber were installed and 3.4% if a magnesium oxide scrubber were constructed. The average monthly residential electricity bill in 1982 would only increase $.95–$1.27 depending on the type of scrubber selected. P. Ex. 14; Tr. 272–274.

(4) An analysis of the operation and maintenance costs of the Mitchell Station Unit No. 3 with a scrubber installed, as compared to the operational costs for the rest of the power plants owned by Allegheny Power System, Inc., indicates that, on a rational economic basis, Allegheny Power System would choose to install a scrubber at the Mitchell Station Unit No. 3 rather

than close the unit. After installation of a scrubber, the cost of operating Mitchell Station Unit No. 3 would still be less than purchasing power from another utility, and, in fact, would be less expensive than operating nine other plants in Allegheny Power System's power pool in its place. Pltf. Ex. 14; Tr. 275–280, 321.

(d) The Pennsylvania Public Utility Commission has stated in recent opinions that expenditures for pollution control equipment would be included in the rate base and made specific reference to the installation of scrubbers. *Penna Public Comm. v. Duquesne Light Co.*, Rate Investigation Docket (RID) No. 89, p. 22 (July 30, 1974); *Penna Public Utility Comm. v. Duquesne Light Co.*, RID 198, pp. 6, 7 (July 13, 1976); *Penna Public Utility Comm. v. Penna Power Co.*, RID No. 243, pp. 9–10 (Jan. 27, 1977). See Tr. 666, 7; Mr. Glauthier's rebuttal deposition pp. 12–15.

C. West Penn's Defense That The Applicable Emission Limitation is More Stringent Than Necessary to Attain and Maintain NAAQS is Without Merit

1. The National Primary Ambient Air Quality Standards (NAAQS) for sulfur dioxide are 80 micrograms per cubic meter (.03 parts per million) as an annual average and 365 micrograms per cubic meter (.14 parts per million) as a 24 hour average. (Tr. 1039) (See 40 CFR 50.1 et seq.). There is also a secondary standard for a three hour period, not to be exceeded over once a year of 1300 micrograms per cubic meter (.5 parts per million) (1040).

2. The modeling effort of a defendant's witnesses contain numerous errors in methodology, which cast doubt on their conclusions.

3. Defendant's modeling efforts contain errors in data reduction, which also cast doubt on their conclusions.

4. Defendant's modeling, even if valid, does not support a finding of over stringency in the sulfur dioxide emission limitations.

5. Plaintiff's modeling efforts, which the court accepts demonstrate that as applied to all sources in and around Allegheny County or to the Mitchell Power Station, the sulfur dioxide emission limitation is not more stringent than necessary to attain and maintain NAAQS. (See P. Ex. 44, 46).

6. Actual monitoring studies conducted in the vicinity of Mitchell Power Station demonstrate actual violations of NAAQS caused by the Mitchell Station, and validate the Cramer model.

## C. DISCUSSION

This case presents another instance of the tensions which arise when the interests of the public in removal of pollutants from the atmosphere clash with those of the power companies and their customers. Usually the cry is, "Do you want jobs or a clean environment?" The implication of this argument is you can't have both.

When the polluter is a power company with its emission of smoke including sulfur dioxide ($SO_2$) the issue becomes more confused because the same public with interest in a clean environment is also interested as consumers in keeping utility rates down in a time of increasing inflation. The determination of this clash of interests, however, as illustrated in this case is basically a problem for the legislature, not the courts. The federal courts are only empowered to act in this area to enforce legislation passed by Congress unless it is made to appear that the legislation regulating this subject conflicts with the constitution. Absent this it is our duty to enforce the mandates of Congress.

Litigation continued over four years by the defendant in this case has substantially increased costs of compliance with the Clean Air Act passed by Congress in 1970 and amended in 1977 (Now 42 U.S.C. § 7401, et seq.). After eleven days of hearings on the government's application for a preliminary injunction the court is not convinced that the defendant has made any showing of constitutional violation in application of the statute to it, that substantial and continued violations of the act have been shown and the government is entitled

to a preliminary injunction in accordance with 42 U.S.C. § 7413(b).[2]

The early history of the attempts of this defendant to avoid compliance with Clean Air Act is set forth in the opinion of our Court of Appeals in *West Penn Power Company v. Train*, 522 F.2d 302 (3d Cir. 1975) affirming on somewhat different grounds the decision of this court in *West Penn v. Train*, 378 F.Supp. 941 (1974) wherein we held we had no jurisdiction to enter a declaratory judgment or an injunction against the Environmental Protection Agency (EPA). The Court of Appeals held that defendant's claims of denial of due process as the result of technological or economic infeasibility of compliance with the Act and regulations pursuant thereto could be presented to the State Department of Environmental Resources (DER) or to this court in an enforcement proceeding. (See 522 F.2d at 312). After denial of certiorari by the U.S. Supreme Court and a later attempt to file a late appeal from denial of the Pennsylvania State Implementation Plan (SIP) (See 538 F.2d 1020 (3d Cir. 1975)) the defendant elected to follow the routes indicated and a proceeding for further variance is now pending before the State Environmental Hearing Board (EHB).

Finally, on October 3, 1977 the U.S. filed this enforcement suit against defendant alleging continuous violation of the regulations governing emission of sulfur oxides in excess of the permissible rate, notwithstanding notice of violation issued by the EPA on September 13, 1973, received by defendant September 17, 1973. The government seeks both a preliminary and permanent injunction under § 113(b) of the Act (42 U.S.C. § 4213(b)) and a civil penalty

of not more than $25,000 per day as also authorized by the Act from August 7, 1977, the effective date of the 1977 Amendments to the Clean Air Act (P.L. 95–95, 91 Stat., pp. 685, 701).

The court has held that in this proceeding the defendant is entitled to a full and fair hearing on its claims of violation of due process as required by our Circuit in *West Penn Power v. Train*, 522 F.2d 302, supra. The court has also in this respect heeded the thoughts expressed by the U.S. Supreme Court on this subject in *Union Electric Co. v. E. P. A.* 427 U.S. 246 at 266–269, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976). For these reasons, the court has denied the government's motions to limit the defense in this respect. Nevertheless, after eleven days of hearings on the government's request for a preliminary injunction the court determines that no legal showing of technological or economic infeasibility or impossibility of compliance has been shown and that the government has otherwise shown itself entitled to a preliminary injunction.

Despite the lapse of over 4½ years since the issuance of notice of violation by EPA the defendant has continued its course of violation. The record shows that the Mitchell plant of the defendant is the second largest emitter of $SO_2$ in the area[3] and its Boiler No. 33 with a rated capacity of 291 megawatts, the main target in this suit, emits more $SO_2$ than the Clairton Works of U.S. Steel Corporation a short distance down the Monongahela. This plant exceeded in 1972 and continues to exceed the National Ambient Air Standards for $SO_2$ (40 CFR 52.2021).[4] The Pennsylvania SIP provides for an emission limitation of .6 pounds per million BTU of heat input.[5] In

---

2. "(b) The Administrator shall, in the case of any person which is the owner or operator of a major stationary source, and may, in the case of any other person, commence a civil action for a permanent or temporary injunction, or to assess and recover a civil penalty of not more than $25,000 per day of violation, or both, whenever such person—

(1) violates or fails or refuses to comply with any order issued under subsection (a) of this section; or

(2) violates any requirements of an applicable implementation plan (A) during any period of Federally assumed enforcement, or (B) more

than 30 days after having been notified by the Administrator under subsection (a)(1) of this section of a finding that such person is violating such requirement; or"

3. Note: The plant is located in Washington County on the West bank of the Monongahela but the air currents carry its emissions into Allegheny County across the river.

4. See *West Penn Power v. Train,* supra, Footnote 27 approved by Admr. of EPA May 31, 1972, 37 Fed.Reg. 10842.

5. See 25 Pa.Code 123.22.

September 1973 the date of the violation notice, defendant was emitting $SO_2$ at a rate of 3.38 pounds and in June 1976 at a rate of 4.51 pounds.

These figures alone show the need for action by the courts in this situation. The defendant did secure an extension from the Pennsylvania authorities on September 19, 1973, for compliance until June 30, 1976. Notwithstanding the granting of this extension defendant has done nothing to comply in the two years since that date. Instead it has chosen to continue to litigate while costs escalate. Defendant now has further proceedings pending before the Pennsylvania Agency and we will not interfere with them, but this is no reason for this court withholding action in this case as will be discussed later. It was noted by the Pennsylvania EHB in its opinion of June 19, 1978 in the case of *West Penn Power Co. v. Commonwealth of Pennsylvania*, DER, Docket No. 73 -330 D, that West Penn by its legal contests has succeeded in avoiding emission controls on Boiler 33 for five years.

All this is contrary to the intent of Congress in passing this statute. It has been held by the U.S. Supreme Court that until he gets a variance (which may or may not be approved as an amendment to the SIP if it results in violation of national standards *Train v. National Resources Defense Council*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975), the polluter is subject to existing requirements. Congress foresaw that there might be protracted litigation, as here, in attempts to secure variances, but such litigation is to be carried out on the polluter's time, not the public's. As to this the court said in *Train v. N. R. D. C.*, supra.

"As made clear in the *Getty* case [*Getty Oil Co. v. Ruckelshaus*, 342 F.Supp. 1006 (D.Del.1972)] cited by the First Circuit, a polluter is subject to existing requirements until such time as he obtains a variance, *and variances are not available under the revision authority until they have been approved by both the State and the Agency. Should either* entity *determine that granting the variance would prevent attainment* or mainte-nance of national air standards, the polluter is presumably within his rights in seeking judicial review. This litigation, however, is carried out on the polluter's time, not the public's for during its pendency the original regulations remain in effect, and the polluter's failure to comply may subject him to a variety of enforcement procedures."

See also *Getty v. Ruckelshaus*, 467 F.2d 349 (3d Cir. 1972).

To make sure that defendant's rights to due process are being respected, the court has heard lengthy testimony expert and otherwise, as to the technological and economic infeasibility of installing scrubbers to reduce the $SO_2$ emissions at this plant to comply with national standards. We have also received testimony as to whether the national standards could be achieved by the use of so called "Tall Stacks" (750 Feet in height or more) in possible combination with low sulfur coal. We have done so in compliance with what we regard as the determination of this circuit in *West Penn Power Co. v. Train*, supra, and the use of such defense in enforcement proceedings as suggested by the U.S. Supreme Court in *Union Electric Co. v. E. P. A.*, supra. We assume that if defendant, which has the burden of persuasion on this point, could demonstrate that it was practically impossible to comply with the regulations and that the government was requiring it to expend upwards of $60 million for nothing this would be a defense to an enforcement proceeding. But the court holds that this has not been shown, as yet, in this case.

We also have considered what the U.S. Supreme Court has said as to such defense in *Union Electric v. E. P. A.*, supra, 427 U.S. at 256–259, 96 S.Ct. at 2525:

"As we have previously recognized, the 1970 Amendments to the Clean Air Act were a drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution. The amendments place the primary responsibility for formulating pollution control

strategies on the States, but nonetheless subject the States to strict minimum compliance requirements. These requirements are of a 'technology-forcing character', *Train v. N. R. D. C.*, [421 U.S.] at 91 [95 S.Ct. 1470 at 1487] and are expressly designed to force regulated sources to develop pollution control devices that might at the time appear to be economically or technologically infeasible."

"The Senate's stiff requirement was intended to foreclose the claims of emission sources that it would be economically or technologically infeasible for them to achieve emission limitations sufficient to protect the public health within the specified time. As Senator Muskie, manager of the Senate bill, explained to his chamber:

' "The first responsibility of Congress is not the making of technological or economic judgments—or even to be limited by what is or appears to be technologically or economically feasible. Our responsibility is to establish what the public interest requires to protect the health of persons. This may mean that people and industries will be asked to do what seems to be impossible at the present time." ' 116 Cong.Rec. 32901–32902 (1970).

. . . This position reflected that of the Senate committee:

'In the Committee discussions, considerable concern was expressed regarding the use of concept of technical feasibility as the basis of ambient air standards. The Committee determined that (1) the health of people is more important than the question of whether the early achievement of ambient air quality standards protective of health is technically feasible; and (2) the growth of pollution load in many areas, even with application of available technology, would still be deleterious to public health.

'Therefore, the Committee determined that existing sources of pollutants either should meet the standard of the law or be closed down . . . ' S.Rep.No. 91–1196 pp. 2–3 (1970)."

It thus appears as stated in *Union Electric*, supra (427 U.S. p. 255, 96 S.Ct. 2518) that Congress intended to take a stick to the states and to industry to force development to technology which at a given point in time might appear difficult, if not practically impossible. The goal is the prompt attainment of national standards. If defendant's claims of technological difficulties and high costs were to prevail then as pointed out by the Supreme Court, the legislative judgment would be rendered a nullity.

In *Essex Chemical Corp. v. Ruckelshaus*, 158 U.S.App.D.C. 360, 486 F.2d 427 (1973) which dealt with many of the technical aspects involved in this problem 158 U.S. App.D.C. at p. 373, 468 F.2d at p. 440 it was indicated that the lime slurry scrubbing system was the best method. A large amount of testimony was taken to show that lime scrubbers were too recent a development and too unreliable for use on the Mitchell Station. One witness, Slack, stated that nothing short of perfect scrubber performance 100% of the time would satisfy him, despite the fact that any mechanical device is subject to breakdowns on occasion and Boiler No. 33 on which the scrubber would be installed has to be shut down for repairs several times a year. The costs of three possible types of scrubbers, lime, limestone and magnesium oxide (the last appears more desirable but also most expensive) would be $34.9 million, $37.2 million and $56.1 million according to the testimony of Ponder (G. Ex. 11). The court finds that $50–$60 million testified to by Cress is probably closer to the fact today (p. 880) plus $9 million for a spare module indicating that these costs are not beyond the bounds of economic possibility for this company, considering its revenues and assets as shown by its balance sheet.

The court further notes that the defendant is presently installing a lime scrubber on its new Pleasants Station in Belmont, West Virginia and on three similar power stations under planning by this defendant or its parent corporation for Armstrong

County. In addition Duquesne Light Company supplying much of Allegheny County is using units on two of its plants. The Government's evidence G. Ex. 12 shows that 16 utilities are presently operating 24 scrubbers and that approximately 39 others are installing or planning such installation. The question then arises why should West Penn Power's Mitchell plant alone be exempt from these requirements? The above brief resume states why the court has concluded that neither technological nor economic infeasibility has been shown.

The court has been most concerned with the problem of disposal of sludge resulting from the use of lime and limestone scrubbers. The magnesium oxide scrubber is a regenerable process whereby sulfur and sulfuric acid are produced which by-products appear marketable. But the lime or limestone processes do not separate out the sulfur and the resulting sludge must be disposed of somewhere. Dumping it into the Monongahela River is obviously not the answer since this merely transfers the pollutant from the air and land to the water.[6] Land fill methods do pose problems of obtaining available land and transportation, whether by truck, pipeline or barge.

The court nevertheless finds that the problem is not insoluble and with forced technology as required by *Union Electric,* supra, proper disposal may be obtained.

■ The court is aware that proceedings are pending before the Pennsylvania state agency, the Department of Environmental Resources. Throughout this proceeding the defendant has sought to inject the state issues into the proceeding. The court has steadfastly refused to consider these matters, not only out of proper deference under our federal system to the proper jurisdiction of the state authorities but also because the issues there are different. We have heeded the admonition of our Court of Appeals in *West Penn. Power v. Train,* 522 F.2d 302 at 312 that there is no justification for interference with state courts and state remedies.

This is all in accord with the thinking of the U.S. Supreme Court in *Union Electric Co.,* supra, holding that the states are free to adopt stricter standards than the national standards. See 427 U.S. p. 266, 96 S.Ct. p. 2529 of *Union Electric* where the court said:

"Our conclusion is bolstered by recognition that the Amendments do allow claims of technological and economic infeasibility to be raised in situations where consideration of such claims will not substantially interfere with the primary congressional purpose of prompt attainment of the national air quality standards. Thus, we do not hold that claims of infeasibility are never of relevance in the formulation of an implementation plan or that sources unable to comply with emission limitations must inevitably be shut down.

"Perhaps the most important forum for consideration of claims of economic and technological infeasibility is before the state agency formulating the implementation plan. So long as the national standards are met, the state may select whatever mix of control devices it desires, *Train v. N. R. D.C.,* supra, [421 U.S.] at 79, [95 S.Ct., at 1481], and industries with particular economic or technological problems may seek special treatment in the plan itself. Cf. 40 CFR 51.2(b)(d) (1975); S.Rep.No. 91–1196 p. 36 (1970). Moreover, if the industry is not exempted from, or accommodated by, the original plan, it may obtain a variance as petitioner did in this case and the variance, if granted after notice and a hearing, may be submitted to the EPA as a revision of the plan. . . . Lastly, an industry denied an exemption from the implementation plan, or denied a subsequent variance, may be able to take its claims of economic or technological infeasibility to the state courts. See e. g. . . . Pa. Stat.Ann. Tit. 71, § 1710.41 (1962)."

Defendant is presently seeking a variance from the state authorities. Such variance

---

**6.** See *Essex Chemical Co. v. Ruckelshaus,* supra.

if granted will have to be approved by the EPA. See 42 U.S.C. § 7410(a)(3)(A), (§ 110(a)(3)(A) of the federal act), and § 110(d) and provisions for extension in § 110(e).

Whether such variance will be granted by the EHB, or approved by the Pennsylvania Courts on appeal, or by the EPA administrator are matters hidden behind the veil of the future. We do note, however, that the EHB has issued a well considered opinion in this matter on June 19, 1978, Docket 73330, supra, in which some very cogent questions are asked of defendant.

Meanwhile the Pennsylvania SIP remains the state plan which the federal administrator is bound to enforce as part of the Clean Air Act. If later a variance is granted by the state authorities and approved by the EPA administrator, we will of course, have to reconsider the relief granted. Until then, we are bound to enforce the law as it exists at the present time.

During the trial of this case the issue of "Tall stacks" was explored. The court concludes that initially at least this issue is for the state authorities. The state EHB opinion of June 19, 1978, agrees (P. 8) that the defendant's own evidence tends to show that the Mitchell plant is presently with the use of 2.8% sulfur coal causing a violation of the standards. The EHB holds that tall stacks are not completely precluded under federal law, citing *Kennecott Copper Corp. v. Train*, 526 F.2d 1149 (9th Cir. 1975). Defendants proposed 750 foot stack, it is stated, may cause acid rain in dispersing the pollutant over a large territory not presently subject to pollution from it. Defendant claims that new § 123 (42 U.S.C. § 7423)[7]

requires credit for tall stack in measuring compliance, and that it can demonstrate that this is less expensive and the regulations are more stringent than necessary. It is claimed that the tall stack in conjunction with the use of low sulfur coal will enable Mitchell to be in compliance with the national standards.[8]

It is noted that the EHB seems a little dubious of the defendant's ability to make a showing of this kind and asks pertinent questions such as:

" . . . we deem a major question to be what would be the effect if all power plants in the relevant area which should probably include power plants considerably south and west of the southwest AQCR) were allowed to use tall stacks as a means of achieving ambient standards. Mr. McFarland, West Penn's primary witness, believes that ambient standards could be achieved in this manner, although West Penn made no attempt to demonstrate that by modeling or any other evidence. It is a fact alluded to in much of the testimony thus far that most other power plants in the air basins have installed scrubbers or are in the process of installing scrubbers. To us, therefore, West Penn must demonstrate why it should be treated differently from other power plants in this area. West Penn maintains that those scrubbers do not work efficiently and that ambient standards are still being violated around power plants with scrubbers. Although this seems to be true, it is also true that the installation of scrubbers and desulfurization of by product coke oven gas have reduced the amount of $SO_2$ in the atmo-

**7.** The degree of emission limitation required for control of any air pollutant under an applicable implementation plan under this title shall not be affected in any manner by—

(1) so much of the stack height of any source as exceeds good engineering practice (as determined under regulations promulgated by the Administrator), or

(2) any other dispersion technique. The preceding sentence shall not apply with respect to stack heights in existence before the date of enactment of the Clean Air Amendments of 1970 [enacted Dec. 31, 1970] or dispersion techniques implemented before such date. In establishing an emission limitation for coal-fired steam electric generating units which are subject to the provisions of § 118 [42 U.S.C. § 7418] and which commenced operation before July 1, 1957, the effect of the entire stack height of stacks for which a construction contract was awarded before February 8, 1974, may be taken into account.

**8.** For a good discussion of § 123 and tall stacks see 22 Villanova Law Review 117 (1978).

sphere in the southwest AQCR. Probably most $SO_2$ sources could argue that the regulation as applied to each alone is invalid because more stringent than necessary to achieve NAQS. Every source can also make the argument that if other sources were better controlled they would not need to be so tightly controlled. We would agree with the contention that one source should not have to make up for another's failure to comply with emission regulations. We are not sure how this cuts, however, since at the present time both Clairton and Mitchell (and probably Elrama) are in violation of applicable emission limitations, but Clariton and Elrama are on approved compliance schedules. Admittedly, Clairton is a much larger source than Mitchell.

"The question in our mind comes down to whether there is any basis for treating Mitchell differently from other combustion sources in the relevant air basin and that is a question not of the general validity of the $SO_2$ regulation itself but whether there are circumstances that require an exception to that regulation and whether the package of regulations is invalid for failure to allow for alternatives in exceptional circumstances. We are not convinced that there are exceptional circumstances here. The circumstances thus far demonstrated by West Penn are that it is a medium sized power plant located further from the rollback area hot spots than some other major sources in a place where the prevailing winds would tend to disperse the plumes east-northeast over an area outside the nonattainment area. If there are other conditions that distinguish Mitchell from other plants in this area in terms of economics and technology, it may be appropriate to consider whether the legislative choice in favor of constant emission control in this air basin for this plant is justified where an alternative control strategy exists that should achieve the declared purpose of the regulation—meeting federal ambient air standards for $SO_2$. Considering the presumptive

validity to be accorded the regulation, *Rochez Bros., Inc. v. Department of Environmental Resources,* 18 Pa.Comm.Ct. 137, 334 A.2d 790 (1975), we may very well conclude that the legislative choice in favor of constant emission controls as opposed to dispersion techniques is justified regardless of cost—particularly in view of the other policy objections to tall stacks. However, given West Penn's allegations of impossibility and the possible consequences of shutting down the Mitchell plant, we cannot sustain the application of the regulations without assessing West Penn's evidence as to economics and technology."

Regardless of this, we adhere to the prior ruling in this case not to interfere with or decide state issues and to leave for the present to the state authorities whether the state standards are overly stringent and whether a variance is indicated for West Penn. By the same token, we have refused a stay of these proceedings.

With respect to § 123 it is noted that the tall stack at Mitchell is not presently there and would have to be constructed in the future. No construction contract has presently been awarded. It is not clear what height might be indicated by good engineering practices, particularly in the light of terrain obstacles. (The east bank of Monongahela opposite the plant rises approximately 500 feet). A tall stack may merely dump the pollutants on Liberty and Glassport Boros. The EPA Administrator has not to date found that a tall stack will result in compliance, the court is not convinced of this result, and for the present, we must order plans for compliance.

■ Finally, the court holds that the government has made out a case for issuance of a preliminary injunction, the tests for which in this Circuit are set forth in *Delaware River Authority v. Trans American Trailer Inc.,* 501 F.2d 917 (3d Cir. 1974).

The court has found there is a violation and that relief must be granted the govern-

ment. The facts as recited above show that the violation of the Clean Air Act is continuing and increasing, thus indicating irreparable harm. The fact the violation has been clearly proven makes out the likelihood of success on the merits under 42 U.S.C. § 7413(b) (§ 113(b) of the Act). Indeed, the administrator under this section had a mandate to seek relief in the courts. Further the fact is that this is an injunction sought pursuant to an Act of Congress (§ 113(b)). In such cases it has been held that irreparable injury need not be shown since the danger to the public's health and welfare has already been established by the Congress. See *Hecht Co. v. Bowles*, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944); *Shafer v. U. S.*, 229 F.2d 124 (5th Cir. 1965).

Likewise where the public interest lies has been determined by Congress. There are no equities in defendant's favor as the result of continuing and increasing violations and in view of the limited preliminary relief we will grant—we do not now shut down the plant.

The above also disposes of defendant's rights to preliminary relief under its counterclaim which will be denied.

### RELIEF

Both the government and the defendant have submitted proposed orders to the court and suggestions as to relief in case the same be granted. The court finds defendant's order unacceptable as it would, in effect, postpone relief until the conclusion of the state proceedings. The government's proposal on the other hand we find too stringent in that the court finds 36 months [9] will be required to complete and place in operation a Flue Gas Desulfurization System and it does not provide for monthly reports or sanctions to ensure defendant is effectively pursuing in good faith a program looking to compliance.

While the government has disclaimed any desire to shut the Mitchell plant down, the defendant nevertheless, proceeded on its own initiative to place this plant out of service from October, 1977, to December 21, 1977, when under order of this court on defendant's motion for emergency interim relief the court limited the ultimate civil penalty to be assessed to $500 per day. This was directed in order to reduce public hardship and suffering caused by a general shortage of electricity occasioned by the national coal miner's strike then in progress. Except for two operating shutdowns of two and four days each the plant continued in operation until April 9, 1978 after the end of the strike, since which time it has again been voluntarily shutdown, whether with or without the blessing of the Public Utility Commission, we are not advised.

At the present time, we shall only require that defendant get about the planning for and construction of a Flue Gas Desulfurization program for Boiler No. 33 at its Mitchell Plant. We view the preliminary injunction in such situation as coercive only and will impose no penalties by way of a preliminary injunctive decree as long as defendant actively and in good faith pursues such program. In the event of failure in this respect a coercive penalty of $2500 per day will be imposed.

The matter of final penalties as we read 113(b) will have to await the final decision on the merits. At that time final determination can be made in the light of the factors to be considered under the last paragraph of 113(b), viz: the size of the business, the economic impact of the penalty and the seriousness of the violation, together with other factors. Meanwhile, we have considered these factors in determining the appropriate coercive penalty to be assessed. This is a large enterprise as shown by the financial statements, the violation is serious, but the court does not intend to force

---

9. See testimony of Cress that the installation could be completed in 27 months if the progress is accelerated.

shutdown under the threats of interim penalties approaching the maximum of $25,000 per day.

We have again considered the problem of Constitutional tolling, i. e. withholding penalties where an appeal can only be taken at the risk of great penalties, as recently explored by Judge Snyder of this court in *U. S. v. Gulf Oil Corp.*, 408 F.Supp. 450 (W.D. Pa.1975) and again hold it has no application until we reach a final decision on the merits, settling finally the amount of civil penalties to be assessed under 113(b).

The court has given due consideration to the decision of the Eastern District of Missouri in *Union Electric Co. v. EPA*, 450 F.Supp. 805 wherein Judge Harper issued a preliminary injunction March 16, 1978, enjoining the EPA from instituting an enforcement proceeding against the utility while it was pursuing a variance before the Missouri authorities. While this court does not agree with all that is said in that case, it is sufficient for our present purposes to point out that the facts were substantially different. In the Missouri district case the utility was burning low sulfur coal and its $SO_2$ emissions were not in violation of the national standards as had been found by the EPA itself. It thus appeared that Missouri standards were higher than necessary to attain the national standards. The utility was required to post bond of $500,000.

## CONCLUSIONS OF LAW

(1) This court has jurisdiction of the parties and the subject matter of this action.

(2) The defendant is and has been for over four years in violation of the Clean Air Act and the regulations adopted pursuant thereto and the Pennsylvania State Implementation Plan approved by the EPA Administrator pursuant thereto.

(3) Defendant's violations are serious and substantial and increasing in degree with the passage of time.

(4) Defendant has not shown any deprivation of property without due process whether substantive or procedural.

(5) Defendant is not entitled to a stay pending pursuit of its variance proceedings in the Pennsylvania State Agencies or courts.

(6) Defendant is not entitled to preliminary relief on its counterclaim.

(7) Plaintiff is entitled to a preliminary injunction granting relief calculated to ensure compliance with the Act and regulations in the form of the appropriate order entered herewith.